# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| MICHAEL L. REYNOLDS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | CAUSE NO. 1:13-CV-00329 |
|  | ) |  |
| CAROLYN W. COLVIN, Acting | ) |  |
| Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## OPINION AND ORDER

Plaintiff Michael Reynolds appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Reynolds applied for DIB and SSI in August 2012, alleging disability as of January 16, 2012. (Tr. 91-97.) The Commissioner denied his application initially and upon reconsideration. (Tr. 41-42, 59-61, 64-66.) After a timely request (Tr. 57-58), a hearing was held on June 20, 2013, before Administrative Law Judge ("ALJ") Terry Miller, at which Reynolds, who was represented by counsel; his wife; and a vocational expert testified (Tr. 590-650). On July 3, 2013, the ALJ rendered an unfavorable decision to Reynolds, concluding that he was not

---

[1] All parties have consented to the Magistrate Judge. (Docket # 16); *see* 28 U.S.C. § 636(c).

disabled because he could perform a significant number of jobs in the economy despite the limitations caused by his impairments. (Tr. 25-36.) The Appeals Council denied his request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 6-9.)

Reynolds filed a complaint with this Court on November 15, 2013, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Reynolds alleges that the ALJ: (1) assigned a residual functional capacity ("RFC") that is not supported by substantial evidence; (2) improperly assessed the medical source opinions, including Dr. Bacchus's; (3) failed to consider the combined impact of his impairments; (4) improperly discounted the credibility of his symptom testimony; and (5) failed to cite a significant number of jobs at step five. (Pl.'s Br. in Supp. of Reversing the Decision of the Commissioner of Social Security 11-25.)

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Reynolds was forty-nine years old (Tr. 91); had a high school education and one year of college (Tr. 110, 598); and had work experience as a material handler, production supervisor, and stocker (Tr. 111, 211). He alleges that he became disabled due to coronary artery disease, fibromyalgia, and anxiety. (Tr. 110, 119, 121, 167, 609-10.)

### B. Reynolds's Testimony at the Hearing

At the hearing, Reynolds, who was five feet ten inches tall and weighed approximately 245 pounds, testified that he lives with his wife and adult child in a one-story home. (Tr. 596-97.) Reynolds is independent with his self care, but his wife performs most of the household

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 650-page administrative record necessary to the decision.

chores and manages their finances. (Tr. 626-28, 630.)  He drives a car, visits the library on his own, and occasionally attends his grandson's soccer games (Tr. 597-98, 631); after attending an hour-long game, he goes home to bed (Tr. 631).  His daily routine involves caring for pets, playing computer games, napping, watching sports, and reading. (Tr. 626-27.)  He plays with his grandchildren while lying on the couch or sitting in a lawn chair. (Tr. 629-30.)

As to his physical problems, Reynolds complained of chronic muscular pain due to fibromyalgia and shortness of breath after walking one block. (Tr. 606-08.)  He can "walk a little bit" and stand or sit for ten minutes (Tr. 614, 616-17, 633); if he mows the yard, it takes him three or four days to recover (Tr. 614).  If he picks something up, he is afraid he will drop it; he feels he is losing grip strength. (Tr. 618-19, 637.)

Reynolds stated that his pain is from "head to toe," "never, ever lets up," and "the bigger the muscle, the more pain involved." (Tr. 611; *see also* Tr. 614, 616-17, 636.)  He described it as intense, extreme, achy, burning, aching, throbbing, or stabbing in nature. (Tr. 633-35.)  On a scale of one to ten, he rated his hip pain a "seven" and his back pain an "eight." (Tr. 635-36.)  He testified that most of his prescribed medications were not effective; only Tramadol "scrapes the edge of the pain to where it's more easily manageable." (Tr. 612-13.)

As to his mental symptoms, Reynolds complained of significant "fibro fog" causing him difficulty with concentration and memory. (Tr. 614-15; 622-23.)  He sometimes cannot recall if he took his medications. (Tr. 623.)  He also asserted that although he has always suffered from anxiety and depression, his symptoms have significantly worsened since the onset of his physical problems (Tr. 620-22).  He takes Clonazepam for anxiety, but nothing for depression (Tr. 621, 624); he characterized his anxiety problems as "three times worse than [his] depression" (Tr.

3

624). Reynolds stated that although his anxiety medications work pretty well, he is still easily angered and at times can feel "almost out of control" (Tr. 621, 623-24), especially when he is out in public or thinking about finances (Tr. 621).[3]

*C. Summary of the Relevant Medical Evidence*

In January 2012, Reynolds had a myocardial infarction; he then underwent cardiac catheterization with stenting of the right coronary artery, followed by cardiac rehabilitation. (Tr. 223-24, 258, 261, 280-81, 346, 501, 554.) The following month, Dr. Basil Genetos, a cardiologist, noted that Reynolds continued to have a lot of fatigue, as well as arthralgias of uncertain etiology. (Tr. 341-42.) A March 2012 perfusion study was abnormal, showing left ventricular cavity dilation and evidence of previous infarction of the inferior wall. (Tr. 280-81.)

Reynolds was readmitted on March 21, 2012, for progressive angina secondary to his underlying multi vessel coronary atherosclerosis. (Tr. 304.) Cardiac catheterization showed occlusion of a branch of the right coronary artery (Tr. 304), but this was of no consequence (Tr. 366).

On April 2, 2012, Dr. W. Wilson, a cardiologist, noted that Reynolds reported marked daytime fatigue, increased leg fatigue during cardiac rehab, joint pain, and lack of energy. (Tr. 338-39.) He adjusted Reynolds's medications. (Tr. 339.) Similarly, on April 7, Dr. Genetos documented that Reynolds reported profound fatigue and muscle aches since his myocardial infarction. (Tr. 334.) He further adjusted Reynolds's medications in the event they were causing his symptoms. (Tr. 334.) On May 1, Dr. Genetos observed that Reynolds had recovered well from a cardiac perspective with no ongoing cardiac symptoms; accordingly, he released him to

---

[3] Reynolds's wife also testified at the hearing, essentially corroborating his testimony. (Tr. 640-42.)

return to work. (Tr. 328-29.) He noted, however, that Reynolds reported constant noncardiac chest pain and diffuse myalgias, arthralgias, and fatigue; and thus, would probably see Dr. Sean Brennan in the near future for evaluation of those symptoms. (Tr. 329.)

The following month, Reynolds was evaluated by Dr. Kenneth Smith, a rheumotologist. (Tr. 365-68.) He noted that Reynolds moved slowly and stiffly, but a musculoskeletal exam was unremarkable except for moderate tenderness over the sacrum and posterior pelvic brim. (Tr. 367.) Otherwise, his muscles were nontender, and his grip and muscle strength were normal. (Tr. 367.) Dr. Smith found no physical evidence of any inflammatory rheumatic disease to account for Reynolds's complaints, but thought he "may have an element of fibromyalgia." (Tr. 367.)

On May 21, 2012, Dr. Brennan noted that Reynolds reported continued muscle pain and difficulty working. (Tr. 378.) He prescribed Cymbalta, but later switched him to Lyrica. (Tr. 378, 448.) On July 27, 2012, Dr. Brennan noted that Reynolds's condition was worsening and that Lyrica had not helped. (Tr. 447.)

Reynolds saw Dr. Garland Anderson on July 31, 2012, reporting that he was having difficulty working as a night shift stocker due to his pain. (432.) Dr. Anderson noted multiple areas with pain and tenderness upon motion and palpation. (Tr. 433.) He ordered further testing, adjusted Reynolds's medications, and recommended he stay off work for the time being. (Tr. 434.) In August, Dr. Anderson indicated that the medications were not working and that Reynolds remained off work. (Tr. 429-30.) In September, Dr. Anderson wrote that Reynolds had decreased range of motion and pain in multiple areas. (Tr. 425, 427.) In October, Dr. Anderson reported that Reynolds continued to have fatigue, insomnia, back pain, myalgia, gait problems,

arthralgia, agitation, and decreased concentration; he referred to Reynolds's fibromyalgia as "severe and incapacitating." (Tr. 416.)

On October 31, 2012, Dr. M. Bhat examined Reynolds on referral from Dr. Anderson. (Tr. 395-97.) Dr. Bhat noted diffuse tenderness in Reynolds's arms and legs, but normal strength, coordination, and gait. (Tr. 396.) He concluded there was no evidence of primary muscle disease and that Reynolds's muscle pain represented fibromyalgia. (Tr. 396.) He adjusted Reynolds's medications and recommended he participate in vocational rehabilitation. (Tr. 397.)

On November 2, 2012, Amanda Mayle, Psy.D., examined Reynolds on behalf of the Social Security Administration. (Tr. 400-03.) Dr. Mayle observed an anxious mood, irritable affect, pressured and tangential speech, rapid thought process with flight of ideas, and an inability to perform serial sevens. (Tr. 402-03.) She opined that Reynolds had significant mood and behavioral instability that was affecting his functioning. (Tr. 402.) She assigned a Global Assessment of Functioning ("GAF") score of 51 and diagnosed him with generalized anxiety disorder and major depressive disorder.[4] (Tr. 402-03.)

On November 5, 2012, Dr. H. Bacchus examined Reynolds on behalf of the Social Security Administration. (Tr. 404-07.) Dr. Bacchus observed coarse breath sounds; a slow and somewhat stiff gait; poor to fair gait sustainability on even ground; squatting limited to one-third

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

down with support and arising slowly; decreased muscle strength and tone in all extremities; decreased grip strength; slow dexterity; some difficulty with heel, toe, and tandem walk; an inability to hop; limited range of motion in his neck, low back, right shoulder, knees, right ankle, and right hip; straight leg raising of forty-five degrees on the right and sixty on the left; and mild diffuse tenderness to palpation in all extremities, lower back, and sacrum. (Tr. 405.) He also noted that Reynolds had a flat affect and anxious mood. (Tr. 405, 407.) Diagnoses included hypertension; history of single vessel coronary artery disease with myocardial infarction; a history of angina pectoris; fibromyalgia; and a history of anxiety. (Tr. 406.) Dr. Bacchus concluded that with cardiac stability, Reynolds "could perhaps perform at least part-time, light duties, mainly sit-down in nature in a low-stress work environment." (Tr. 406.)

In November 2012, Dr. Anderson penned a letter stating that Reynolds was "unable to be gainfully employed" due to both acute and chronic pain syndrome and ongoing chronic pain management. (Tr. 412.) In December, Dr. Anderson noted that Reynolds had impaired range of motion, decreased strength, weakness in lower extremities, and severe muscle spasms. (Tr. 409.) He reiterated that Reynolds was unable to be gainfully employed. (Tr. 410.) On February 1, 2013, Dr. Anderson wrote that Reynolds was unable to sit, stand, or walk for more than a few minutes. (Tr. 582.) He observed that Reynolds had multiple pain triggers throughout his body, weak grip, and limited motion in his back and legs. (Tr. 583.) He again wrote that Reynolds was unable to be gainfully employed and that there were "multiple reasons for disability." (Tr. 583.) Similarly on February 28, 2013, Dr. Anderson documented that Reynolds reported "extreme pains all over his body," had numbness of his legs, and was unable to work. (Tr. 575-76.) He encouraged Reynolds to stop smoking. (Tr. 576.)

7

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12

8

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On July 13, 2012, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 25-36.) He found at step one of the five-step analysis that Reynolds had not engaged in substantial gainful activity after his alleged onset date. (Tr. 27.) A

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

step two, the ALJ concluded that Reynolds had the following severe impairments: history of single vessel coronary artery disease/atherosclerotic cardiovascular disease, hypertension, hyperlipidemia, and status post myocardial infarction and stent placement; diffuse myalgias and arthralgias/fibromyalgia and muscle fatigue; obesity; and generalized anxiety disorder and major depressive disorder. (Tr. 27-28.) The ALJ determined at step three, however, that Reynolds's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 28-29.)

Before proceeding to step four, the ALJ determined that Reynolds's symptom testimony was not credible to the extent it portrayed limitations in excess of the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . (lifting, carrying, pushing, and pulling 20 pounds occasionally and 10 pounds frequently and, in an eight-hour period, sitting or standing/walking for a total of 6 hours each) except that he needs a sit/stand option (which allows for alternating between sitting and standing up to every 30 minutes, if needed, but the positional changes will not render the claimant off task). He cannot climb ladders, ropes, or scaffolds at all and he can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He also needs to avoid concentrated exposure to temperature extremes, humidity, pulmonary irritants (such as fumes, odors, dust, gases, chemicals, and poorly ventilated areas), and hazards (such as operational control of dangerous moving machinery, unprotected heights, and slippery/uneven/moving surfaces). Mentally, the claimant cannot understand, remember, or carry out detailed or complex job instructions but can perform only simple, repetitive tasks on a sustained basis (meaning 8 hours per day/5 days per week or an equivalent full-time work schedule). He cannot perform tasks involving sudden or unpredictable workplace changes. He must be able to work at a flexible pace (where the employee is allowed some independence in determining either the timing of different work activities or the pace of work). He can have only casual/superficial interactions with others, including supervisors, co-workers, and the general public. He cannot have exposure to intense or critical supervision.

(Tr. 29.)

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Reynolds was unable to perform any of his past relevant work. (Tr. 34.) The ALJ then

10

concluded at step five that Reynolds could perform a significant number of jobs within the economy, including hand packager, routing clerk, and office helper. (Tr. 35.) Therefore, Reynolds's claim for DIB and SSI was denied. (Tr. 35.)

*C. The Administrative Record Is Materially Incomplete, and Thus, the Court Cannot Evaluate Whether the RFC Is Supported by Substantial Evidence*

In crafting an RFC for a limited range of light work, the ALJ assigned "greater weight" to the opinions of the state agency doctors, together with the opinions of treating cardiologist Dr. Genetos, who released Reynolds to return to work in May 2012; the GAF score of 51 assigned by examining psychologist Dr. Mayle; and the "low-stress work" limitation articulated by examining Dr. Bacchus. (Tr. 31.) In doing so, the ALJ indicated that the state agency doctors found Reynolds could perform a limited range of light work; understand, remember, and carry out semi-skilled tasks; and relate on at least a superficial basis with coworkers and supervisors. (Tr. 31.)

But the administrative record, which the Commissioner produced in paper form only (Docket # 13), is incomplete. It does not contain these state agency doctors' opinions for the Court's examination.

"The administrative record is essential for meaningful judicial review of a decision by the Commissioner." *McChullough v. Apfel*, 95 F. Supp. 2d 956, 957 (S.D. Ind. 2000). In performing the review, the court "must meticulously examine the record." *Edwards v. Astrue*, No. 09-2120-CM-GBC, 2010 WL 2787847, at *3 (D. Kan. June 30, 2010) (internal quotation marks omitted) (collecting cases). "The court has the authority to remand a case for further consideration if it is unable to exercise meaningful or informed judicial review because of an inadequate administrative record." *Id*. at *4; *see DeCoito v. Astrue*, No. 1:07-cv-330, 2008 WL 906164, at

11

*8 (S.D. Ind. Mar. 31, 2008) (remanding case where certain exhibits were missing from the administrative record, and thus, the court could not "provide meaningful judicial review").

To clarify, "the court will not remand merely for a ministerial correction." *Edwards*, 2010 WL 2787847, at *4 (citation omitted); *see Burton v. Barnhart*, No. 06-1051-JTM, 2006 WL 4045937, at *4 (D. Kan. Nov. 1, 2006) ("[I]f the missing documents are immaterial to the ALJ's decision, or not relied on in his opinion, a remand would not be warranted."). "The touchstone is whether the administrative record that does exist permits meaningful review." *Edwards*, 2010 WL 2787847, at *4. "[W]here the ALJ's findings were derived from information the Commissioner failed to include in the record before the court, the court is unable to engage in meaningful judicial review, and the case must be remanded." *Id.* (collecting cases); *see Garcia v. Colvin*, No. cv 12-06542-MAN, 2014 WL 358396, at *4 (C.D. Cal. Jan. 30, 2014) (remanding case where the record omitted a physician's opinion that the ALJ had rejected).

Here, the opinions of the state agency doctors are material to the ALJ's decision as he assigned them "greater weight." (Tr. 31.) He emphasized that these state agency doctors were "specifically trained in evaluating an individual's physical and mental condition for the Social Security Administration's disability programs, unlike Dr. Anderson and Dr. Bacchus, Jr." (Tr. 32.) Although the ALJ summarized in two sentences the content of the state agency doctors' reports (Tr. 31), this does not allow the Court to perform the "meticulous examination of the record required by law"–that is, reviewing, among other things, the narrative comments of the doctors, if any, and the date of the reports. *Hill v. Astrue*, 526 F. Supp. 2d 1223, 1230 (D. Kan. 2007) (remanding the Commissioner's decision where the ALJ relied on the state agency doctor's opinion and a portion of the doctor's assessment was missing from the record). As

such, the Court finds that the omission of the state agency doctors' reports is material and precludes meaningful judicial review.[6] *See, e.g.*, *Edwards*, 2010 WL 2787847, at *4; *DeCoito*, 2008 WL 906164, at *8 .

### D. The ALJ's Rationale for Rejecting a Portion of Dr. Bacchus's Opinion Is Not Adequately Articulated or Supported by Substantial Evidence

In addition, the ALJ's rationale for assigning "greater weight" to a portion of Dr. Bacchus's opinion, while rejecting another portion of his opinion that contradicted the assigned RFC, is not adequately articulated and supported by substantial evidence.

To review, Dr. Bacchus examined Reynolds in November 2012 at the request of Social Security, concluding that "[w]ith cardiac stability, he could perhaps perform at least part-time, light duties, mainly sit-down in nature in a low-stress work environment." (Tr. 406.) Ultimately, the ALJ afforded "greater weight" to Dr. Bacchus's opinion that Reynolds could work in a "low-stress environment," but rejected Dr. Bacchus's view that Reynolds was limited to part-time work. (Tr. 31-32.)

An ALJ must "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (citation omitted). In an attempt to do so, the ALJ first recited that Dr. Bacchus was not a specialist or a state agency medical expert. (Tr. 32.) But the ALJ's logic in this respect is not traceable; at the same time that he rejected Dr. Bacchus's opinion limiting Reynolds to part-time work, the ALJ assigned "greater weight" to Dr. Bacchus's opinion concerning a low-stress work environment. (*See* Tr. 32 ("The undersigned [ALJ] assigns greater weight to the opinions of the State Agency

---

[6] The Commissioner did not respond to Reynolds's argument that the state agency doctors' opinions were not included in the administrative record. (Pl.'s Br. 13; Docket # 25.)

medical experts, Dr. Mayle, Dr. Genetos, and Dr. Bacchus Jr. (with regard to the low-stress limitation) than to the opinions of Dr. Anderson and Dr. Bacchus Jr. (with regard to the limitation for part-time light, sit-down work.").) Accordingly, the first reason provided by the ALJ is illogical and inconsistent, and thus, does not build an "accurate and logical bridge" from the evidence to his conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (citation omitted).

Next, the ALJ states that Dr. Bacchus's limitation to part-time work (as well as Dr. Anderson's opinion that Reynolds is unable to work) is not "well-supported by the record when viewed as a whole, especially considering both the claimant's activities and the objective medical evidence of record." (Tr. 32.) But the ALJ does not explain how Reynolds's daily activities, which are fairly limited in nature and frequented with rest breaks (Tr. 614, 616-17, 626-31), are inconsistent with a limitation to part-time work. (Tr. 32.) Elsewhere in the decision, the ALJ summarized Reynolds's daily activities as follows: "[He] is able to drive, play games on a computer, do some cooking, help his wife fold clothes, use at telephone, stay in contact with his family members, let his dogs out, play cars with his grandsons sometimes, watch television, go out alone, and read." (Tr. 28, 32.)

The Court is "hard-pressed to understand how [these minimal daily activities] support[ ] a conclusion that [Reynolds] was able to work a full-time job, week in and week out, given [his] limitations." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). "[M]inimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." *Clifford*, 227 F.3d at 872; *see also Ramey v. Astrue*, 319 F. App'x 426, 430 (7th Cir. 2009) (unpublished) (opining that the claimant's minimal daily activities, which included two hours of house chores

14

punctuated with rest, cooking simple meals, and grocery shopping three times per month, were not inconsistent with her claims of disabling pain); *Zurawski*, 245 F.3d at 887 (same).

And with respect to the ALJ's reasoning that Dr. Bacchus's part-time work limitation is inconsistent with "the objective medical evidence of record" (Tr. 32), courts have observed:

> Fibromyalgia is a mysterious disease; doctors know very little about what causes it or how to treat it. There are no objective medical tests that can confirm the existence of fibromyalgia. Rather, the principal symptoms, which include persistent pain, fatigue, disrupted sleep, stiffness, and numerous tenders spots on the body, are all subjective.

*Allen v. Massanari*, No. 01 C 1045, 2002 WL 398510, at *9 (N.D. Ill. Mar. 14, 2002) (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996)); *see Harbin v. Colvin*, No. 11 c 3037, 2014 WL 4976614, at *5 (N.D. Ill. Oct. 6, 2014) ("Fibromyalgia is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints."); *Kurth v. Astrue*, 568 F. Supp. 2d 1020, 1032-33 (W.D. Wis. 2008) (stating that "subjective complaints in [a fibromyalgia] case are more important than in other cases because they are clinical indicators of the disease of fibromyalgia"). The ALJ's rejection of Dr. Bacchus's limitation to part-time work on the basis that it was inconsistent with the "objective medical evidence of record" seemingly fails to take into account the unique nature of fibromyalgia-type symptoms. *See, e.g.*, *Aidinovski v. Apfel*, 27 F. Supp. 2d 1097, 1104 (N.D. Ill. 1998) (remanding the ALJ's decision, which discounted claimant's doctors' reports because they were not based on objective medical evidence, because he did "not take into account the unique nature of fibromyalgia").

Moreover, the Commissioner's *post-hoc* assertion that the ALJ correctly rejected Dr. Bacchus's part-time work limitation because it was based on "ongoing health and cardiac risk factors" is misplaced. (Def.'s Mem. in Supp. of the Commissioner's Decision 10.) The

15

Commissioner's argument goes likes this: Dr. Bacchus based his limitation to part-time work, at least in part, on Reynolds's cardiac instability; and the ALJ's rejection of this limitation was proper because Dr. Genetos, Reynolds's treating cardiologist, had released him to return to work six months earlier.[7] (*Id.*)

But this is not an accurate characterization of the record. Rather, the ALJ stated: "Claimant does have ongoing health and cardiac risk factors. *With cardiac stability*, he could perhaps perform at least part-time, light duties, mainly sit-down in nature, in a low-stress work environment." (Tr. 406 (emphasis added).) Thus, Dr. Bacchus's opinion that Reynolds could perform at least part-time work presumed, in fact, that he was stable from a cardiac standpoint. Accordingly, the Commissioner's *post hoc* argument does not bolster the ALJ's rejection of this portion of Dr. Bacchus's opinion.

In sum, because the ALJ failed to adequately articulate his rationale for rejecting the portion of Dr. Bacchus's opinion restricting Reynolds to part-time work, and because the reasoning he did articulate concerning the limitation was logically flawed, the ALJ's consideration of Dr. Bacchus's opinion will be remanded.[8]

---

[7] The Commissioner also contends that Reynolds is "simply speculati[ng]" by asserting that his release to return to work without restrictions in May 2012 by Dr. Genetos was "only . . . a general cardiac clearance to work" that did not address his other health problems. (*Id.* at 9.) But Reynolds's characterization of Dr. Genetos's opinion has support in the record. When releasing Reynolds to return to work, Dr. Genetos stated that although Reynolds had "done well cardiac wise," he "[u]nfortunately . . has been plagued ever since then by constant left sided chest pain along with diffuse myalgias, arthralgias and fatigue." (Tr. 328.) Dr. Genetos then indicated that Dr. Brennan would probably be seeing Reynolds in the near future for "evaluation of his arthralgias, myalgias and fatigue." (Tr. 329.)

[8] Because a remand is necessary based on the omission of the state agency doctors' opinions and the ALJ's consideration of Dr. Bacchus's opinion, the Court need not reach Reynolds's remaining arguments.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Reynolds and against the Commissioner.

SO ORDERED.

Enter for this 15th day of October, 2014.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge